Hubert **HURT**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 44451.

Court of Criminal Appeals of Texas.

May 31, 1972.

Paul Lyle, Plainview (appointed by the Court), for appellant.

Tom Hamilton, Dist. Atty., Plainview, Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

This is an appeal from a conviction for assault with intent to rape. Trial was before a jury, which assessed punishment at confinement for 45 years.

Appellant raises five grounds of error. In his first ground of error, he contends that the trial court improperly permitted the State to ask a defense witness, Dr. Bublis, a psychiatrist, several "have you heard" questions at the punishment stage of the trial. The record reflects that the State asked the witness if she had heard of thirteen separate acts of misconduct. The witness answered that appellant had told her of certain of the acts, but in answer to most of the questions she answered, "No."

Prior to this series of questions, Dr. Bublis had testified, in summary, that she had examined appellant and that, based upon her examination, she was of the opinion that he was suffering from alcoholism and the effects of drugs. In response to a hypothetical question based on the evidence previously adduced in the case, she testified that, in her opinion, appellant did not know the nature and quality of his acts at the time of the commission of the offense. At no time was she asked, nor did she state her opinion in regard to appellant's reputation.

Prior to the "have you heard" questions, the trial court conducted an examination of the witness out of the presence of the jury, at which the State asked the "have you heard" questions. The court held that the questions were permissible as a test of the witness' opinion. The court ruled that the State could ask the witness if she had heard of the offenses, and if she had not, whether she would have changed her opinion had she known of them. Appellant was granted a continuing objection. Thereafter, the jury returned and the State proceeded to ask the questions. The witness did not testify that she had formed her opinion based upon her knowledge of appellant's prior criminal record. The witness was not asked whether she would have changed her opinion if she had known or heard of the acts. She was merely asked if she had heard of certain acts of misconduct.

We feel that the questions, as asked, were improper. "Have you heard" questions are proper only when propounded to a witness who has testified as to the reputation of the person in question. The questions are permitted only for the purpose of testing the witness' knowledge of the person's reputation. Also, the questions may not be phrased so as to imply that the offense has been committed. A detailed discussion of the rationale of "have you heard" questions appears in the recent case of Brown v. State, 477 S.W.2d 617 (Tex.Cr.App., delivered February 16, 1972). Any further discussion in this opinion would be superfluous.

We now turn to the question of whether the error in permitting this line of questions was of such magnitude as to compel a reversal of this case. After a careful examination of the record, we are of the opinion that the error was harmful to appellant.

The record reflects that defendant testified in his own behalf. On voir dire examination, out of the presence of the jury, appellant testified that he had been previously convicted of crimes on four occasions, and that his probation which had been granted in one prior case had been revoked. The trial court ruled that the State could introduce evidence of three convictions, but that a 1953 conviction and subsequent probation revocation were too remote to be admissible. Thereafter, appellant testified in the presence of the jury that he had been convicted on three occasions, twice in 1961 and once in 1969.

In our opinion, the net effect of the questions propounded to Dr. Bublis was to convey to the jury the impression that appellant had a long criminal record. The

tone of the questioning was such that the "have you heard" questions were taken as established fact by the questioner. For example, immediately following the questions, the following transpired between counsel for the State and the witness:

"Q Now, Doctor, I will ask you if in your experience as a psychiatrist, you have had occasion to observe people who consistently run afoul of the laws and the mores and the standards of society?

"A Yes.

"Q I'll ask you also, Doctor, *if this record which I have just asked you about here* is consistent with a person who has difficulty reforming and who has difficulty complying with the mores and the standards and the laws of society?

"A Certainly sounds consistent with that. Might I add that if he were drinking, this would fit in even more so with the history of alcoholism as we know it.

"Q But irrespective of whether he was drinking or whether he was taking drugs, or whatever it might be, *it does show* a person who has had difficulty reforming and difficulty of complying with the laws and standards of our society?

"A Yes." (Emphasis supplied)

This line of questions certainly infers that the questions were intended to be considered as established fact by the witness and likewise, by the jury.

Three of the "have you heard" questions were based upon the convictions which appellant had testified that he had received in the past. Two of the questions were based upon 1953 and 1954 conviction and revocation of probation, respectively, which appellant acknowledged on voir dire, but which the trial court had excluded as being too remote. "The law places no limitation by reason of remoteness on prior convictions offered to show the prior criminal record of the defendant." Ingram v. State, 426 S.W.2d 877, 878 (Tex.Cr.App. 1968); accord, Rose v. State, 470 S.W.2d 198 (Tex.Cr.App.1971); see Art. 37.07, Sec. 2(b), Vernon's Ann.C.C.P. Therefore, had the state chosen to offer evidence of the 1953 and 1954 conviction and revocation at the punishment stage of the trial, it would have been admissible. Thus, the net effect of the questions was to place eight additional acts of misconduct before the jury.

In this case it is difficult to state with certainty that the error was either harmful or harmless, nevertheless, considering the number of acts and the general tone of the questioning, we feel that the probability of undue prejudice being formed in the minds of the jury was great enough to warrant a reversal of this conviction.

We do note that appellant, on re-direct examination, asked the following question:

"Q Dr. Bublis, now, after having in your storehouse of information these questions that the District Attorney asked you about what you had heard about the defendant, Hubert Hurt, does this change the opinion that you gave earlier when you told this jury that you had an opinion as to his state of mind at the time of the offense in question, and that your opinion was that he did not know, based upon reasonable medical probability that he did not know the nature and quality of his act, and that he did not know the difference between right and wrong?

"A This information does not change my opinion about his mental status at the time of the act."

This Court stated in Patterson v. State, 458 S.W.2d 658, 660 (Tex.Cr.App.1970):

"There would appear to be a conflict in cases as to whether an accused may complain of admission of testimony

where his own counsel adduces the same testimony upon cross-examination. Cf. Ervin v. State, Tex.Cr.App., 367 S.W.2d 680, with Willoughby v. State, 87 Tex. Cr.R. 40, 219 S.W. 468, where this Court said, 'We know of no decision of this Court nor rule of criminal law which compels an accused when evidence has been admitted over his objection to refrain from the right of cross-examination as to such evidence, or else be penalized by the loss of his objection and bills of exceptions.'

"The Willoughby case seems to represent the correct rule - except in cases where the cross-examination extends so far beyond the scope of the direct examination so that it can be said the cross examiner has legitimately made the witness his own witness."

■ We do not feel that the above question met this test. Therefore, the objection was not waived.

In light of our disposition of this ground, we need not consider appellant's remaining grounds of error.

The judgment is reversed and the cause is remanded.

MORRISON, Judge (concurring).

I agree with the reversal of this conviction and shall state my reasons.

I believe the train got off the track when the State took the position that the expert witness, Dr. Bublis became a reputation or character witness when she took the stand in mitigation of punishment due to appellant's mental problems. She was not qualified by appellant as either a character or reputation witness. See Brown v. State, supra, and Jones v. State, Tex.Cr. App., 479 S.W.2d 307 (1972). Therefore, she should not have been subjected to "have you heard" type questions which are reserved for character and reputation witnesses under Article 37.07, Sec. 3(a), V.A. C.C.P. This is the converse of the situation presented in Allaben v. State, Tex.Cr. App., 418 S.W.2d 517. I believe the learned trial judge failed to pull the train back on the track by misinterpreting the reason Dr. Bublis was presented as a witness for the appellant.

I concur.

DOUGLAS, Judge (dissenting).

In Tulia, on December 1, 1969, about 11:00 p. m., Jay Washington, who resided within twenty-five or thirty feet from the garage apartment of Tiny Lee Deal, heard a noise like someone was beating on a door, a girl scream and then a gunshot. He called the police.

John Elliff and Jerry Shannon, both of the Tulia Police Department, arrived. While underneath the apartment, they heard bumps and thuds and moans. When they got to the door, Officer Elliff could hear moans and something that sounded to him like somebody "hitting a wet sack on a table." He then shined a light into the darkened apartment and saw Hurt, the appellant, with a blackjack in his hand, on his knees and bending over Miss Deal. Hurt saw the officers and started toward them. On the way he tried to get a pistol out of a front pocket, but the officers subdued him and took a blackjack and a .38 caliber H & R revolver from him. The pistol contained three live and one spent shell.

When the officers entered, Miss Deal was on her back, her panties were pulled down around her ankles. Hurt was bending over her with his trousers unbuttoned or unzipped. Miss Deal stated, "He's going to kill and rape me." According to Officer Shannon the whole apartment was "red with blood." There was blood on the ceiling.

Miss Deal testified that she was twenty-four years of age. On the night in question the telephone rang. She answered, but all she could hear was breathing and the caller would not answer. Later that

evening, she heard someone coming up the steps apparently two or three at a time. She attempted to call her landlady and by the time she had dialed two or three numbers Hurt had broken through the locked screen and locked door both. He asked where his wife and baby were and told Miss Deal that she was going with him to find them. She refused. He tried to make her leave, he started fighting and she screamed. He told her to shut up or he would shoot her. She then heard a gun go off and felt a hot burning on the back of her head. The next thing that she remembered she was on the floor and he was beating her. She felt blows on the back of her head and on her hands. She thought he was beating her with a "hoe file."

After part of the beating, he turned her over on her back, pulled up her dress and her panties down to her ankles. He got up, turned off the light, got on top and started choking her until she was almost unconscious. The officers arrived and she remembered being placed on a stretcher and taken to the hospital where she remained for some five days.

She had injuries all over her head and skin graft was required. Two of her fingers were broken and a knuckle of a finger was knocked out of place.

Dr. James J. Scarborough testified that he treated Miss Deal on the night in question. His examination revealed scalp wounds which covered the entire back side of her head. "The scalp was actually cut into ribbons, just, I don't know how many different cuts were there. Many, many, different cuts so that the scalp was kind of like a puzzle. It actually required a lot of time to piece the right pieces together to where it covered and fit properly." She had four fractures on her right hand.

Hurt testified that he was thirty-three years of age and that he and his wife went to the church that Miss Deal attended. His testimony was that he had been drinking on the night in question and had gone to the apartment of Miss Deal in an attempt to locate his wife and he had no intention to rape Miss Deal. He further testified that after she started screaming, he did not know what happened until the officers slapped him and he then came back to his senses. When he went into the apartment Miss Deal was talking over the telephone and "I didn't know whether she was calling the law——." At this point he was interrupted by his attorney.

Also on direct examination he testified that he was convicted for passing a forged instrument in 1955[1] in Littlefield on a plea of guilty. He also testified that he had been convicted for forgery in Brownfield.

On cross-examination he admitted that in 1961 he had been convicted in Quanah for passing a worthless check and had paid a fine and that in July of 1961 he was found guilty in Littlefield and assessed two years for forgery. He also admitted that in 1969 he had been convicted for passing a forged instrument in Lamb County and was assessed a term of five years.[2]

He testified that he did not remember shooting the gun and wondered how the blood got on his trousers. He also could not recall other blackout spells, but he may have had them and then testified that he had not had other blackout spells.

On redirect he testified that along with the whiskey and beer that he had drunk he had taken Darvon pills the day in question.

At the penalty stage of the trial, several witnesses testified that appellant's reputation was bad.

1. He was asked if he was convicted in 1965, and he answered 1955. He later testified that this was some six years before the trial.

2. The court did not permit the prosecutor to ask about a 1953 conviction for theft from the mail and forgery where he was placed on probation in El Reno, Oklahoma, and later that probation was revoked in December of 1954.

Mrs. Mary Bublis, called by the appellant, testified that she was a psychiatrist and that she had examined the appellant twice after the date of the offense and that she had a very comprehensive interview with him. She concluded that he was not mentally ill. She was asked a hypothetical question based upon the answers Hurt had given during the guilt stage of the trial. She answered that, based on the facts that Hurt's counsel had given her (in the question) "plus the history that I know of Mr. Hurt of his earlier experiences with alcohol and drugs, I would say he was out of contact with reality at that time." She testified that she thought he was in a blind rage and was psychotic at the time and had an organic type of amnesia.

She also testified that the mental status exam did not produce the kind of sadistic picture of a person who ordinarily would do such acts without the factors of alcohol and the drug.

On cross-examination, Dr. Bublis was asked, and she answered as follows:

"Q. (District Attorney) Doctor, you mentioned this man's former experience with alcohol and drugs. What is his former experience?

"A. Well, from the history that I obtained from Mr. Hurt, I gathered that he has a long year's of episodic excessive use of alcohol, and at times convinced with various synthetic analgesics in which Darvon is one of them."

With this background, the controlling issue in the case will be discussed. Was reversible error committed when the court permitted the district attorney to ask Dr. Bublis if she had heard about other convictions and charges against the appellant?

Outside the presence of the jury Dr. Bublis testified that Hurt had told her about other blackouts. (Hurt's testimony at the guilt stage of the trial was that he had had no other blackouts.) He also, according to her testimony, was pretty hard on women and hit them when he had been drinking. The district attorney then stated the defendant had put his character in issue and that the State should be entitled to question the doctor as to whether or not she heard or whether or not she had revealed to her at the time the examination was made, some or many of the previous offenses that had been committed by Hurt.

Hurt's counsel countered that she was not a character witness. The questions were permitted to test the basis of the opinion of the witness on what she had heard and to see if after hearing of these offenses she would have changed her opinion.

Her examination in the presence of the jury showed that she had not heard that he had been convicted of the offense of theft and forgery of United States Treasury checks in 1953; she had not heard that he was charged with the offense of burglary in Kerrville in 1954; that he had been picked up for a parole violation for passing a forged United States Treasury check and assessed a term of two years. She had heard he served time in the penitentiary, but had not heard of the worthless check case in Quanah. She had not heard of a charge of forgery in Brownfield nor a conviction for passing a forged instrument in Lamb County. She had not heard that he was indicted in 1959 in Swisher County for removing mortgaged property nor for the offense in 1957 for stealing a credit card.

When asked if she had heard that Hurt had been charged of aggravated assault upon Joy Hurt, she replied that he shared with her some problems involving his wife. He told her about being charged with driving while intoxicated on October 19, 1969. When asked about being charged in October, 1969, for aggravated assault upon Paula Fay Halsey, she answered that he told her about some of his previous experiences but she was not sure she knew the precise names and dates. Dr. Bublis did not believe that he told her about an as-

sault to murder charge upon Roda Whitworth on October 13, 1969, less than two months before the date of the present offense.

Hurt's attorney then asked:

"Q. Dr. Bublis, now, after having in your storehouse of information these questions that the District Attorney asked you about what you had heard about the defendant, Hubert Hurt, does this change the opinion that you gave earlier when you told this jury that you had an opinion as to his state of mind at the time of the offense in question, and that your opinion was that he did not know, based upon reasonable medical probability that he did not know the nature and quality of his act, and that he did not know the difference between right and wrong?"

and Dr. Bublis answered:

"A. This information does not change my opinion about his mental status at the time of the act."

The "have you heard" questions testing a witness's basis for testifying that an accused has a good reputation should not be confused with the question at hand.

Here the expert witness, Dr. Bublis, based her answer that appellant was psychotic at the time of the assault upon Miss Deal. The State probably should not have asked the "have you heard" questions. It would have been proper and perhaps more harmful to the appellant to have asked the doctor if Hurt had told her about being charged with assault to murder a certain woman or if he had told her about being charged with having committed aggravated assault upon his wife and another woman or if he had told her about being charged with the other offenses.

At least three of the prior convictions were shown at the guilt stage of the trial. Evidence of the other prior felony convic-

tions as far back as 1953 could have been admitted before the jury because a continued course of misconduct and convictions had been shown up until the time of the trial. These felonies, as well as the misdemeanor convictions, could have been proved directly at the penalty stage of the trial under Article 37.07, V.A.C.C.P. They were not challenged and defense counsel did not contend or offer to show that the convictions did not occur.

The matters gone into that could not have been proved directly at the guilt stage of the trial were the charges for certain offenses. There were, among other things, assaults upon other women and driving while intoxicated. These made up a part of the history of the appellant and were subjects of inquiry to determine the basis of the opinion of the doctor that the appellant was psychotic at the time of the commission of the present offense.

Opinion testimony of an expert witness as to the sanity or insanity of a person when based upon the personal observations of the witness rather than solely upon evidence adduced at the trial or upon a hypothetical state of facts is received upon the same principle applicable to non-experts. McCormick & Ray, Texas Law of Evidence, Section 1421, note 31, page 252 (1956). The Texas rule on the scope of cross-examination is limited only by relevancy to the issues and is not applied with the same strictness as in direct examination. Evansich v. Gulf, C. & S. F. R. Co., 61 Tex. 24 (1884); State v. Reeh, 434 S. W.2d 416 (Tex.Civ.App. 1968, writ ref'd n. r. e.); City of Dallas v. Riddle, 325 S.W. 2d 955 (Tex.Civ.App. 1959, writ ref'd n. r. e.). See generally McCormick & Ray, supra, Section 600, pages 467–468.

In McCormick & Ray, Section 1396, page 224, it is written:

"   .   .   .   If it has been shown that the witness had an opportunity to observe and did observe, and if his testimony in opinion-form is of such value as to be admissible, the facts upon which his

opinion is based are matters affecting its weight but seemingly should have nothing to do with admissibility. The grounds of his opinion may be tested by the adverse party on cross-examination."

It should be remembered that the testimony of Dr. Bublis was at the penalty stage of the trial, after the jury had already heard of much of his prior criminal record and after having determined his guilt. The brutal facts in the assault in this case warranted the jury in bringing in a verdict of forty-five years.

If there were error, it is harmless.

I would affirm this conviction.